IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CONSUMER FINANCIAL      :
PROTECTION BUREAU,      :
     :
       Plaintiff,      :
     :
v.      :
     :
FREDERICK J. HANNA &      :      CIVIL ACTION NO.
ASSOCIATES, P.C.; FREDERICK J.      :      1:14-CV-2211-AT
HANNA, *individually*; JOSEPH C.      :
COOLING, *individually*; and      :
ROBERT A. WINTER, *individually*,      :
     :
       Defendants.      :

## ORDER

Frederick J. Hanna & Associates, P.C. (the "Firm") is a self-proclaimed creditors' rights law firm. According to the Consumer Financial Protection Bureau (the "Bureau"), from 2009 through 2013, the Firm's small group of lawyers filed tens of thousands of lawsuits in Georgia each year to recover on allegedly defaulted debt. The Bureau alleges, however, that the Firm's lawyers have essentially no meaningful involvement in these lawsuits. Moreover, according to the Bureau, in these debt-collection lawsuits, the Firm's lawyers rely on affidavits, which the Firm and its three partners named in this case knew or should have known were executed by a person without personal knowledge of the facts contained in those affidavits. For these reasons, the Bureau lodges claims

under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 *et seq.* and the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5536.

Defendants move to dismiss the Complaint [Doc. 20].  With the benefit of oral argument and for the reasons that follow, the Court **DENIES** Defendants' Motion to Dismiss.

## I.   LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-556 (2007); Fed. R. Civ. P. 12(b)(6).  The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a).  In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The plausibility standard

requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556. A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

## II. BACKGROUND

According to the allegations in the Complaint, since January 1, 2009, the Firm has collected or attempted to collect debts for several credit-card issuers and "debt buyers."[1]  (Compl. ¶ 12.)  In the course of its debt collection practice, the Firm routinely files thousands of lawsuits each year.  (*Id.* ¶ 13.)  The Bureau estimates that "in Georgia alone, the Firm sued about 78,000 consumers in 2009; about 84,000 in 2010; about 71,000 in 2011; about 57,000 in 2012; and about 60,000 in 2013."  The total estimated number of collection suits from 2009 through 2013 (the "Georgia Collection Suits") topped 350,000.

---

[1] A "debt buyer" is an entity which "purchase[s] portfolios of defaulted credit-card debts." (Compl. ¶ 7.)  The Sixth Circuit Court of Appeals describes the debt buying industry in its decision in *Stratton v. Portfolio Recovery Assocs, LLC*, 770 F.3d 443, 445-46 (6th Cir. 2014), quoting a District of Columbia District Court decision:

> To recoup a portion of its lost investment, an originating lender may sell a charged-off consumer loan to a Debt Buyer, usually as part of a portfolio of delinquent consumer loans, for a fraction of the total amount owed to the originating lender.  Once a Debt Buyer has purchased a portfolio of defaulted consumer loans, it may engage in collection efforts (or hire a third-party to do so), which may include locating borrowers, determining whether borrowers are in bankruptcy, commencing legal proceedings, or "otherwise encouraging" payment of all or a portion of the delinquency.

*Stratton*, 770 F.3d at 445-46 (quoting *Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 4 (D.D.C. 2006) (internal citations omitted)).

The Bureau maintains that, although the Georgia Collection Suits "may have featured the signatures of attorneys," these lawsuits were in fact "prepared and filed without meaningful attorney involvement" in either the decision to initiate the lawsuit or in the preparation of the pleadings. (*Id.* ¶¶ 17, 28.) To support this assertion, the Bureau points to a number of facts. For example, during the relevant time, the Firm allegedly employed hundreds of non-attorney staff but only between 8 and 16 attorneys. (*Id.* ¶ 14.) The Firm then delegated to the non-attorneys many important responsibilities including determining whether a case was "suit worthy," determining the alleged principal, interest, and attorneys' fees owed, and actually drafting complaints. (*Id.* ¶ 16.) The Bureau further alleges that the Firm's attorneys routinely relied on "an automated system and support-staff research" to determine (1) "whether consumers had sought relief in bankruptcy"; (2) "whether their debts were barred by limitations"; and (3) "legally significant facts such as each consumer's date of initial contract and the date the consumer last made a payment." (*Id.*)

Once the Firm delegated these tasks to non-attorney staff or automated systems, the few attorneys on staff were allegedly left to essentially skim and sign the prepared pleadings. The Firm's attorneys thus allegedly gave "only cursory review to" the suits the Firm was filing, "checking the pleadings prepared by non-attorney support staff for grammar and spelling errors." (*Id.* ¶ 18.) The alleged expectation was that the lawyer would spend "no more than one minute reviewing and signing the pleadings prepared by support staff." (*Id.*) This makes

sense, given the alleged ratio of the volume of lawsuits filed to the number of attorneys at the Firm.   In 2009 and 2010, for instance, the Firm allegedly arranged for one attorney to sign about 138,000 lawsuits, averaging about 1,300 collection suits each week.  (*Id.* ¶ 15.)  Assuming this one attorney did nothing but review and sign collection suits for eight hours a day, five days per week, for every week of the year without vacation, the lawyer would literally have less than a minute to approve each suit.  (*See id.*)  For these reasons, the Bureau alleges that the "Firm's attorneys did not exercise independent professional judgment in determining whether to file the Georgia Collection Suits or what remedies to seek." (*Id.* ¶ 18.)

Moreover, according to the Bureau, the Firm routinely relied on affidavits that its lawyers knew or should have known were executed by persons who lacked personal knowledge of the facts.  (*Id.* ¶ 23.)  Specifically, in support of many of the Georgia Collection Suits, the Firm allegedly offered an affidavit of a person who attested to personal knowledge of the validity and ownership of the debt. (*Id.*)  For those affidavits received from its debt-buyer clients (as opposed to its creditor clients), the Firm allegedly "did not determine whether any underlying documentation for the debt was available."   (*Id.* ¶ 24.)  The Firm also allegedly failed to "review the contracts governing the sale of accounts to determine whether those contracts disclaimed any warranties regarding the accuracy or validity of the debts." (*Id.* ¶ 24.)  Along the same vein, the Bureau also alleges that "Defendants filed the Georgia Collection Suits without investigating or

verifying support for the suits, including whether the facts alleged were true."
(*Id.* ¶ 20.)

Apparently, the Firm's Georgia Collection Suits were largely successful. According to the Bureau, most cases ended in a default judgment or settlement. (*Id.* ¶ 21.)  However, in those few cases where the consumer responded to the lawsuit, the Firm routinely dismissed the cases.  (*Id.* ¶ 22.)  The Bureau reports that since 2009, the Firm voluntarily dismisses about 155 cases each week.  (*Id.*) The Bureau does not allege the reason for these voluntary dismissals.  But the Bureau notes that "consumers who retained attorneys were almost four times more likely to have their cases dismissed."  (*Id.*)

The Bureau argues that the Firm's litigation practices violate the FDCPA and CFPA in two ways.  First, the Bureau argues that the filing of the Georgia Collection Suits, signed by attorneys, falsely conveyed to consumers that an attorney was meaningfully involved in preparing or filing the case.  According to the Bureau, this false implication violates (1) Section 807 of the FDCPA, and specifically 807(3), which prohibits "the false representation or implication that . . . any communication is from an attorney," 15 U.S.C. § 1692e(3), and (2) the CFPA's prohibition against "any unfair, deceptive, or abusive act or practice."  12 U.S.C. § 5536(a)(1)(B).  Second, the Bureau contends that the use of affidavits, which the Defendants knew or should have known were unsupported by personal knowledge, also violates several provisions of the FDCPA, 15 U.S.C. §§ 1692e(2)(A), (10), and 1692f, and the same provision of the CFPA identified

above.[2]  The Bureau overall contends that the Defendants used false or deceptive representations in their consumer collection debt litigation.

## III.   ANALYSIS

Defendants raise several arguments in support of their Motion to Dismiss. First, Defendants assert that the "practice-of-law exclusion" in the CFPA, 12 U.S.C. § 5517(e), bars enforcement of the CFPA claims here.  Second, Defendants argue that the Bureau's claims should be dismissed on constitutional grounds because (1) they infringe on Defendants' First Amendment right to petition the courts for redress and (2) they violate the Equal Protection clause by impeding debt-collection lawyers' fundamental right of access to the courts.   Third, Defendants argue that the Complaint fails to state a claim for relief premised on either an alleged lack of meaningful attorney involvement in the filing of complaints or the Firm's filing affidavits which they knew or should have known were signed by affiants without personal knowledge of material facts averred in the affidavit.  And finally, Defendants urge the Court to limit recovery for the FDCPA claims to the extent they are barred by a one-year statute of limitations.

### A.    CFPA Practice-of-law exclusion

Defendants first argue that the CFPA's "practice-of-law" exclusion, found in § 1027(e) and codified at 12 U.S.C. § 5517(e)(1), precludes the Bureau's CFPA claims brought against the Defendants.  To be clear, the practice-of-law exclusion

---

[2] The Bureau also contends that the types of misconduct alleged above violate 12 U.S.C. § 5536(a)(1)(A), which makes it unlawful to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law."  (Resp. at 24.)  In other words, a violation of the FDCPA is also a violation of the CFPA under this subsection.

does not apply to the FDCPA claims.  *See* 12 U.S.C. § 5517(e)(3) ("Paragraph (1) shall not be construed as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H."); 12 U.S.C. § 5481(12)(H) (defining "enumerated consumer laws" to include the FDCPA); *see also Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) (holding that the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation"); *Miljkovic v. Shafritz and Dinkin, P.A. et al.*,  --- F.3d. ---, No. 14-13715, 2015 WL 3956570 at *4 (11th Cir. June 30, 2015) (holding that the FDCPA applies to litigation activity of lawyers and all documents they file in Court including affidavits, "categorically prohibiting abusive conduct in the name of debt collection" even when the consumer's counsel is the targeted audience).

The Bureau responds to the Defendants' practice-of-law defense by arguing that an "exception" to this exclusion unambiguously applies in this case, providing a carve-out for the Bureau to bring its CFPA claims against Defendants here.  After a thorough consideration of the parties' positions, and with the benefit of oral argument, the Court concludes that the practice-of-law exclusion does not bar the Bureau's CFPA claims.

"As with any question of statutory interpretation, [the Court] begin[s] by examining the text of the statute to determine whether its meaning is clear." *Lindley v. F.D.I.C.*, 733 F.3d 1055 (11th Cir. 2013) (citing *Harry v. Marchant*, 291

F.3d 767, 770 (11th Cir. 2002)).  The Court's analysis stops at a review of the text of a statute "if the statutory language is unambiguous and the statutory scheme is coherent and consistent."  *Med. Transp. Mgmt. Corp. v. Comm'r of IRS,* 506 F.3d 1364, 1368 (11th Cir. 2007).  If the statutory language may be reasonably interpreted in more than one way, however, the statutory language is deemed ambiguous and additional tools of statutory interpretation should be used.  *Id.* Only "in rare and exceptional circumstances" may a court "decline to follow the plain meaning of a statute because overwhelming extrinsic evidence demonstrates a legislative intent contrary to the text's plain meaning."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 238 (11th Cir. 1995).

The CFPA's practice-of-law exclusion begins with a broad limitation on the Bureau's authority.  Under § 5517(e)(1), "[e]xcept as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law."  12 U.S.C. § 5517(e)(1).  This sweeping language encompasses the Firm's alleged activities here — the filing of a lawsuit and the filing of affidavits in connection with a lawsuit — as these are undoubtedly "activit[ies] engaged in by an attorney as part of the practice of law."  *Id; see State ex rel. Doyle v. Frederick J. Hanna & Assocs., P.C.*, 695 S.E.2d 612, 615 (Ga. 2010) ("[T]he manner in which support is used and managed in the representation of clients is part of the actual practice of law. . . .") (holding the Administrator of the Fair Business Practices Act ("FBPA")

could not investigate Frederick J. Hanna & Associates's day-to-day operations because such investigation amounts to an impermissible regulation of the practice of law in the state).  And the Bureau did not dispute, either in its response brief or at oral argument, that the Firm's practices at issue in this case constitute the practice of law under the law of Georgia.  (*See* Resp. at 4-6.)

However, at the outset, the practice-of-law exclusion also contemplates that some activities engaged in by attorneys "as part of the practice of law" may nonetheless be regulated by the Bureau.  *See* 12 U.S.C. § 5517(e)(1).  Accordingly, the statute provides two exceptions to the practice-of-law exclusion in subparagraph (2):

> Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding ***the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5)*** of this title --
>
> (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or
>
> (B) ***that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service***.

12 U.S.C. § 5517(e)(2) (emphasis added).

Although cumbersome, once unpacked, subparagraph (2)(B) unambiguously includes the conduct at issue here and thus provides a carve-out for the Bureau to bring its CFPA claims.  First, to fall within the exceptions to the

practice-of-law exclusion, the activity must involve "the offering or provision of a consumer financial product or service."  The CFPA expressly defines a "consumer financial product or service" to include "collecting debt related to any consumer financial product or service."  12 U.S.C. § 5481(15)(x); *see* 12 U.S.C. § 5481(5)(A). And this definition more specifically includes the act of collecting personal credit-card debt, *see* 12 U.S.C. § 5481(15)(i), which the Firm allegedly engages in.  Thus, the filing of a lawsuit, the purpose of which is to collect on such a debt, is debt collection activity.  *See also Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) ("In ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts.") (citing Black's Law Dictionary 264 (6th ed. 1990) ("To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings.")).

The statute then provides two categories of activities that are not excluded from the Bureau's authority.  12 U.S.C. § 5517(e)(2)(A)-(B).  The first, under subparagraph (2)(A), does not apply here but is nonetheless informative. Subparagraph (2)(A) preserves[3] the Bureau's ability to exercise its authority

---

[3] Defendants challenge the Bureau's assertion that § 5517(e)(2)(B) "preserves" the Bureau's authority to prosecute Defendants.  "Subsection 5517(e)(2) does not provide preservations of authority," Defendants contend, "which are provided in § 5517(e)(3)."  (Reply at 5.)  "Rather," Defendants continue, "Congress explicitly included § 5517(e)(2)(A) and (B) as 'rules of construction' to help delineate the borders of the exclusion — i.e., what constitutes the 'practice of law.'"  (*Id.*)  Defendants' argument falls flat for two reasons.  First, although § 5517(e)(2) and § 5517(e)(3) bear different headings, they in fact accomplish exactly the same goal of carving out exceptions to the practice-of-law exclusion.  Both of these subsections begin with identical language.  *Compare* 12 U.S.C. § 5517(e)(2) ("Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding . . . .),

"regarding the offering or provision of a consumer financial product or service . . . that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* § 5517(e)(2)(A). Thus, the Bureau could, for example, exert its authority over an attorney's debt collection practices so long as such practices are not part of the attorney's law practice occurring exclusively within the scope of his attorney-client relationship. An attorney who engages in pure debt collection activity, completely outside of the practice of law, would be susceptible to the Bureau's authority. *See, e.g.*, *Consumer Fin. Protection Bur. v. ITT Educ. Servs., Inc.*, ---F. Supp. 3d ---, No. 1:14–cv–00292–SEB–TAB, 2015 WL 1013508, at n.29 (S.D. Ind. Mar. 6, 2015) (recognizing that under subparagraph (e)(2)(A), "the CFPA could bring suit against a law firm engaged in the provision of financial products or services"). The alleged CFPA violations here, however, arise out of litigation activities offered as part of Defendants' practice of law which arguably occur exclusively within the Firm's relationship with its clients. Accordingly, the Bureau does not argue that Defendants' conduct falls within the first exception to the practice-of-law exclusion.

Subparagraph (2)(B), on the other hand, encompasses the Firm's alleged conduct. Under Subparagraph (2)(B), the Bureau may exert its authority over an attorney's debt collection practice "that is otherwise offered or provided by the

---

*with* 12 U.S.C. § 5517(e)(3) ("Paragraph (1) shall not be construed as to limit the authority of the Bureau . . . "). Second, the exceptions to the practice-of-law exclusion do not simply define what constitutes the practice of law. As noted above, the exceptions apply to conduct that may in fact constitute a "part of the practice of law." 12 U.S.C. § 5517(e)(1).

attorney in question ***with respect to any consumer who is not receiving legal advice or services from the attorney in connection*** with such financial product or service." 12 U.S.C. § 5517(e)(2)(B).  Here, the debt-collection acts of filing a breach of contract lawsuit and litigating that suit are acts provided to the Firm's creditor clients "with respect to" consumers who themselves do "not receive[] legal advice or services from the attorney." *Id.*  The plain terms of this exception to the practice-of-law exclusion allow the Bureau to bring a CFPA claim here.

At oral argument, counsel for Defendants proposed, for the first time, that four words within subparagraph (2)(B) dictate a different result.  (*See* June 5, 2015 Oral Arg. Tr. (Oral Arg. Tr. at 6-9, Doc. 38.)  These four words, emphasized below, are "otherwise," "the" and "in question."

> Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title --
>
> (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or
>
> (B) that is ***otherwise*** offered or provided by ***the*** attorney ***in question*** with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517(e)(2)(B).  According to Defendants, the term "otherwise" refers to the attorney-client relationship identified just above it in subparagraph (2)(A).

Likewise, Defendants argue that the phrase "**the** attorney **in question**" refers to the attorney referenced subparagraph (A).   Thus, according to Defendants, the conduct in (B) is in fact a subcategory of (A).   Defendants finally observe that, in the Bureau's discussion of the practice-of-law exclusion in the preamble to its Final Consumer Debt Collection Rule — wherein the Bureau interprets § 5517(e)(2)(B) to allow it to exert its authority over attorney debt-collectors who engage in litigation activity — the Bureau strategically omits these four words. *See* 77 Fed. Reg. 65775-01, 65784 (Oct. 21, 2012).   Suggesting a nefarious motive, Defendants counsel explains, "They falsely stated the statute and then falsely stated to this Court what they were basing their interpretation on."   (Oral Arg. Tr. at 9.)   According to Defendants, omitting these four words "totally change[s]" the meaning of § 5517(e)(2)(B).   (Oral Arg. Tr. at 8.)

Although Defendants' point was zealously advanced at oral argument, it is not persuasive.   While Defendants argue that the omission of the four words identified above totally changes the meaning of the subsection, Defendants do not explain precisely how the meaning is totally changed.   They suggest that the conduct in subsection (B) is simply a subcategory of the conduct covered in (A), but they fail to articulate how their proposal makes sense given that the two subsections are provided in the disjunctive as separate exceptions to the practice-of-law exclusion.

It is, on the other hand, much easier to understand the statute's use of the terms "otherwise" and "the attorney in question" to reference the introductory

paragraph of §§ 5517(e)(2) and (e)(1) in a manner that is consistent with the Court's decision that subparagraph (B) carves out the conduct at issue in this case.  Subsection 5517(e)(2) introduces the two exceptions by referring to the Bureau's ability to exercise authority over "the offering or provision of a consumer financial product or service."  Thus, § 5517(e)(2)(B) refers to anything *not* covered in (A) but "otherwise offered or provided" by an attorney.  And "the attorney in question" must refer to the attorney referenced in the practice-of-law exclusion in (e)(1).  Subsection 5517(e)(1) articulates the general exclusion for the practice of law, stating that, except as provided in the two exceptions in subparagraphs (e)(2)(A) and (B), the Bureau may not exercise its authority "with respect to an activity engaged in *by an attorney* as part of the practice of law."  12 U.S.C. § 5517(e)(1) (emphasis added).  The "attorney-in-question is therefore whichever attorney is engaged in the practice of law whose conduct is at issue.  On the other hand, subparagraph (2)(A) makes no mention of a specific attorney in question.  The graphic below summarizes this analysis, and for these reasons, the Court rejects Defendants' argument based on the four words identified above.

(e) Exclusion for practice of law

(1) In general

Except as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in **by an attorney** as part of the practice of law under the laws of a State in which the attorney is licensed to practice law.

(2) Rule of construction

Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding **the offering or provision of a consumer financial product or service** described in any subparagraph of section 5481(5) of this title--

(A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or

(B) that is **otherwise** offered or provided by **the attorney in question** with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517(e)

Defendants next argue that the Bureau's proposed reading of the statute ignores the statutory context of the practice-of-law exclusion.   (Reply at 5.) Defendants accurately report that the exclusion is "broad and sweeping," applying at the outset to all activity "engaged in by an attorney as part of the practice of law."  (*Id.* (citing 12 U.S.C. § 5517(e)(1).)  But Defendants offer no meaningful way to narrow the exception to this exclusion in subparagraph (2)(B), which as noted above is broad enough to encompass the debt-collection practices at issue here.  Defendants instead simply announce that the exceptions "pertain to conduct on the fringe of what some may argue is 'the practice of law.'"  (*Id.* at 6.)   While perhaps subparagraph (2)(A) refers to such "fringe" conduct, the statute contains no textual support for reading this interpretation into subparagraph (2)(B) as well.

Defendants finally argue that if Congress had wanted to "immunize only lawyers who represent consumers," which is essentially the outcome of the Bureau's proposed interpretation of subparagraph (2)(B), Congress could have been clearer. (Reply at 6.)  Maybe so.  But simply because subparagraph (2)(B) is complexly worded, does not mean the Court should disregard its plain meaning.[4] The Court rejects Defendants suggestion that excepting cases such as the one here from the practice-of-law exclusion would be the equivalent of hiding an

---

[4] The Court also notes that Congress's unusual manner of creating a broad exclusion to the Bureau's enforcement authority, and then carving out exceptions to the exclusion using double, or in fact, triple negatives, appears to be the consistent, intentional style of legislative drafting employed in other sections of the statute as well and arguably indicates a careful consideration of the scope of these exclusions.  *See, e.g.,* 12 U.S.C. § 5517(d) ("Exclusion for accountants and tax preparers"); 12 U.S.C. § 5517(b) ("Exclusion for real estate brokerage activities").

elephant in a mousehole.  (Reply at 6 (quoting *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).)  This couldn't be further from the truth.  The CFPA is a consumer protection statute which created the Consumer Financial Protection Bureau.  The Bureau's primary purpose is to "enforce Federal financial law consistently" and "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."  12 U.S.C. § 5511(a).  Allowing the Bureau to enforce its CFPA authority over debt-collection attorneys engaged in litigation activity is fully consistent with this purpose, (*see also infra* Part III.A), as well as Congress's recognition of the debt collection litigation as activity covered under the FDCPA, one of the chief statutes enforced by the Bureau via the CFPA.  *Miljkovic*, 2015 WL 3956570, at *5-6.

Because the statute is clear, "we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."  *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc).  The Court nonetheless briefly addresses Defendants' argument that the statement of one legislator in a conference report evinces Congress's intent to exclude Defendants' conduct from CFPA liability here.

Defendants direct the Court to Representative John Conyers's conference report issued shortly before the law's passage.  Representative Conyers was then the Chairman of the House Judiciary Committee, a committee which according to Conyers, was "instrumentally involved in shaping" several provisions including

the Practice of Law Exclusion.  Conference Report on H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act, Speech of Hon. John Conyers, J. of Michigan, 156 Cong. Rec. E1347-01, 1348-49 (2010).  Conyers recognized that "because of the breadth of the authority being given the Bureau, including the definitions of 'covered person' and 'financial product or service,' and the complexities of the practice of law, there was a concern about potential overlap." *Id.*  Conyers made clear that Congress did not intend to allow the Bureau to regulate the practice of law, which should be left to the state supreme courts and the ethical codes and disciplinary rules governing all aspects of the practice of law.  *Id.*

> Accordingly, our Committee worked to make clear that the new Consumer Financial Protection Bureau established in the bill is not being given authority to regulate the practice of law, which is regulated by the State or States in which the attorney in question is licensed to practice.  At the same time, the Committee worked to clarify that this protection for the practice of law is not intended to preclude the new Bureau from regulating other conduct engaged in by individuals who happen to be attorneys or to be acting under their direction, if the conduct is not part of the practice of law or incidental to the practice of law.

*Id.*  Defendants argue that this is evidence of Congress's intent to preclude the Bureau from bringing the CFPA claims here.

Mr. Conyers's full statement of Congressional intent regarding the practice-of-law exclusion, however, is at most ambiguous when it comes to the specific conduct alleged in this case.  On one hand, Mr. Conyers's use of sweeping language, such as stating that the Bureau was not to be "given authority to

regulate the practice of law," suggests a desire to keep the Bureau out of the practice of law entirely.  *See also id.* (suggesting that anything that is "part of or incidental to the practice of law" should be "excluded from the Bureau's authority").

On the other hand, Mr. Conyers appears to recognize — as the statute does — that even some activities that are "considered part of the practice of law by the State supreme court or other governing body that is regulating the practice of law in the State in question" may nonetheless be regulated by the Bureau.  *Id.*  Mr. Conyers explains that, in order to be free of the Bureau's oversight, a lawyer's actions not only need to be classified as part of the practice of law, but the lawyer's conduct also "must be engaged in exclusively within the scope of the attorney-client relationship; and the product or service must not be offered by or under direction of the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with it."  *Id.* These are essentially the exact exceptions identified in the statute, and according to Conyers, they are intended to offer "further protection against abuse."  *Id.*

Moreover, Mr. Conyers's statements appear singularly focused on attorneys who represent consumers.  Mr. Conyers prefaces his remarks by focusing within "the myriad activities engaged in as part of the practice of law" on those activities which "assist consumer clients in resolving serious debt problems, including but by no means limited to representing them in bankruptcy proceedings."  *Id.*  Later, Conyers explains that Congress wished to avoid causing

"material harm to consumer clients of bankruptcy lawyers, consumer lawyers, and real estate lawyers — the very consumers the Bureau is being created to protect." *Id.* And Conyers does not mention at any point a concern about creditor-attorneys' practice of law. *See id.*; *see also* 77 Fed. Reg. 65775-01, 65784 (noting that Conyers's remarks focused on attorneys who provide legal services to consumers and did not address lawyers who act on behalf of commercial clients).

And finally, the Court must understand Mr. Conyers's statements, and indeed the practice-of-law exclusion itself, within the context of the larger CFPA and even larger Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), of which the CFPA was one part. The Dodd-Frank Act endeavored to, among other things, "protect consumers from abusive financial services practices." Pub. L. 111-203, 124 Stat 1376 (July 21, 2010). To further this purpose, the Dodd-Frank Act established the Consumer Financial Protection Bureau and instructed the Bureau "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511. Thus, Mr. Conyers's statements, and the practice of law exclusion, must be viewed in the context of a proactive, consumer protection statutory scheme — one in which a carve-out to the practice-of-law exclusion for the conduct at issue in this case makes complete sense.

Defendants finally urge the Court to reject the Bureau's interpretation of the exception to the practice-of-law exclusion because of a purported "tradition" of leaving the regulation of the practice of law to the states.  Defendants rely primarily on a decision from the United States Court of Appeals for the District of Columbia Circuit for the proposition that the regulation of the practice of law "is traditionally the province of the states," and thus, if Congress were to disrupt this traditional separation of authority, it would need to be clearer.  (Mot. Dismiss at 8-9, 13 (citing *Am. Bar Ass'n v. Fed. Trade Comm'n*, 430 F.3d 457, 471 (D.C. Cir. 2005) (*ABA*).)  In *ABA*, the American Bar Association and the New York State Bar Association (the "Bar Associations") sought a declaratory judgment that the Federal Trade Commission ("FTC") was not authorized under the Gramm-Leach-Blieley Act ("GLBA") to regulate the confidentiality, privacy and security of information disclosed by clients to their attorneys.  *ABA*, 430 F.3d at 466.  The Bar Associations argued that the GLBA — which regulates financial institutions — was not meant to regulate the practice of law in any way.

The D.C. Court of Appeals agreed.  The Court of Appeals recognized that "[l]ike the statute, the regulations at no point describe the statutory or regulatory scheme as governing the practice of law as such."  *Id.* at 456.  The court then noted the broad manner in which the term "financial institutions" is defined in the statute, but relying on, among things, Congress's centuries-long abstention from regulating the practice of law, held that the GLBA did not cover attorneys engaged in the practice of law.  Defendants argue that this case stands for the

proposition that, for Congress to disrupt the traditional balance, it would need to do so more clearly than it has done in the CFPA.

This argument falls flat for two reasons. First, although as a general matter, the practice of law is regulated by the states, the federal government, with the United States Supreme Court's approval, has historically regulated some aspects of the practice of law. In *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995), the Court held that lawyers engaged in litigation, who are also debt collectors, must still comply with terms of the Fair Debt Collection Practices Act. *Heintz*, 514 U.S. at 295-97; *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, et al.*, 559 U.S. 573 (2010) (recognizing that the "FDCPA imposes some constraints on a lawyer's advocacy on behalf of a client"); *Miljkovic*, 2015 WL 3956570 at *3-6 (applying *Heintz* to all litigation activities of debt-collection attorneys, including sworn replies that are arguably procedural in nature); *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 451 (6th Cir. 2014) (holding that a lawyer debt-collector violates the FDCPA by asserting a false representation regarding the character or amount of the debt, under § 1692e(2), even when such false statements are made in a legal complaint filed in court). And as the Bureau points out, Defendants "cite to no case holding that the regulation of the practice of law belongs exclusively to the states." (Resp. at 7.) *See also ABA*, 430 F.3d at 472 (expressly stating that its holding was not meant to suggest that the federal government could not regulate the practice of law). Indeed, the Georgia Supreme Court has likewise recognized that "the State Bar is not the sole entity authorized

to investigate a lawyer for engaging in unfair debt collection practices." *State ex rel. Doyle v. Frederick J. Hanna & Associates, P.C.*, 695 S.E.2d 612, 615-16 (Ga. 2010) ("Like the dissent, we recognize that the debt collection practices of attorneys 'would be subject to investigation by the Federal Trade Commission, the regulatory entity responsible for enforcement of the FDCPA.'" (quoting *Doyle*, 695 S.E.2d at 620 (Melton, J., dissenting)).

Second, unlike the relevant statute and regulations in *ABA* — which do not even mention the practice of law — the CFPA expressly provides the Bureau a narrow scope of authority over lawyers engaged in activity that is otherwise part of the practice of law.  *See* 12 U.S.C. § 5517(e)(1).  The exceptions to the practice-of-law exclusion must mean something.  Defendants offer no reasonable construction of subparagraph (e)(2)(B), and the *ABA* case does little to further their position.

Because the exception to the practice-of-law exclusion unambiguously covers the alleged conduct here, § 5517(e)(1) does not bar the Bureau's CFPA claims.

### B.    Constitutional Defenses

Defendants next raise two constitutional defenses to the Bureau's FDCPA and CFPA claims.  First, Defendants argue that this case unconstitutionally infringes on their First Amendment right to petition the government for redress. Second, Defendants argue that the Equal Protection Clause of the Fifth Amendment prohibits the Bureau from imposing what amounts to additional

burdens on their ability to file breach of contract lawsuits. Neither argument is persuasive.

### 1. *Noerr-Pennington Doctrine and the Petition Clause*

Defendants first invoke the *Noerr-Pennington* doctrine and their First Amendment right to petition the courts. The *Noerr-Pennington* doctrine, as originally articulated, provided that, because a person has a First Amendment right to petition the government for redress, he is immune from antitrust liability for his efforts to petition. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–57 (1993). This doctrine has been extended to immunize defendants who exercise their First Amendment right to petition the government by resorting to administrative or judicial proceedings, both inside and outside the antitrust context. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see, e.g.*, *Sabal Palm Condos. of Palm Island Ridge Ass'n, Inc. v. Fischer*, No. 12-60691, 2014 WL 988767, at *21-22 (S.D. Fla. Mar. 13, 2014) (recognizing that the *Noerr-Pennington* doctrine applies outside the antitrust context to lawsuits that allege a violation of the Fair Housing Act).

Nonetheless, several courts have considered and rejected the argument that the *Noerr-Pennington* doctrine extends even further to FDCPA claims brought against debt-collectors based on litigation activity. *See Wise v. Zwicker & Assoc., P.C.*, 780 F.3d 710 n.5 (6th Cir. 2015); *Basile v. Blatt, Hasenmiller, Leibsker & Moore LLC*, 632 F. Supp. 2d 842, 845-56 (N.D. Ill. 2009) (collecting

cases).   These courts rely on the Supreme Court's holding in *Heintz*, "which contemplated attorney liability under the FDCPA." *Basile*, 632 F. Supp. 2d at 846 (citing *Heintz v. Jenkins*, 514 U.S. 291 (1995)).   As noted above, in *Heintz*, the United States Supreme Court held that the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation." *Heintz*, 514 U.S. at 299.   The Supreme Court has reaffirmed this principle as recently as 2010 in *Jerman*.  *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, et al.*, 559 U.S. 573 (2010) (holding that a law firm subject to the FDCPA for its litigation activity is not entitled to the bona fide error defense of 15 U.S.C. § 1692k(c) for a mistake of law).   And in neither *Jerman* nor *Heintz* did the Court express a *Noerr-Pennington* concern.   As the Bureau points out, "not a single court in the Eleventh Circuit has ever applied *Noerr-Pennington* to bar an FDCPA claim."   (Resp. at 12 (citing *Roban v. Marinosci Law Grp.*, 34 F. Supp. 3d 1252, 1255 (S.D. Fla. 2014) ("Deutsche Bank and Marinosci Law failed to cite to a single case from the Eleventh Circuit that extends the Noerr–Pennington doctrine to claims brought under the FDCPA. The Court could not find any in its independent research.")).)   Moreover, the Eleventh Circuit's recent decision in *Miljkovic* re-emphasized its recognition of the FDCPA's protection of consumers from the full sweep of debt collectors' attorneys' false, misleading, or deceptive litigation activities.

Defendants direct the Court to *Hemmingsen*, in which the Eighth Circuit Court of Appeals affirmed dismissal on summary judgment of an FDCPA claim

26

brought against a creditor's lawyers, holding that the specific statements at issue — those made in a legal memorandum and client affidavit — were simply not false or misleading. *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814, 819 (8th Cir. 2012). The court did not rule, however, that the *Noerr-Pennington* doctrine applied; in fact, the court made no mention of that doctrine at all. Instead, the court simply concluded that the statements at issue — made in summary judgment briefing long after a debt collection lawsuit began and made for the purpose of persuading the court to grant relief — were simply not false or misleading in such a way as to trigger FDCPA liability. *Id.* at 819-20.

> It was not false or misleading to submit a client affidavit and legal memorandum arguing [the defendant's] legal position that Ms. Hemmingsen was liable for the unpaid account balance, even if [her husband, George] was the only one who used the credit card and made partial payments on the account, when [the creditor's] records reflected that George submitted the initial application, added Ms. Hemmingsen to the account by phone, neither spouse questioned statements identifying it as a joint account, partial payments were made by checks from a joint account, and a Marital Termination Agreement signed by Ms. Hemmingsen listed it as a joint obligation for the couple's "living expenses." The fact that a state court judge rejected the contention, unaware that Ms. Hemmingsen had personally made at least one payment on the account, does not prove that those assertions were false or misleading for purposes of § 1692e. Nor has Ms. Hemmingsen produced any evidence showing that the state court judge — or anyone else — "was misled, deceived, or otherwise duped" by [the defendant's] pleadings.

*Id.* at 820 (quoting *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 945 (7th Cir. 2011) (Tinder, J., concurring), cert. denied, 132 S.Ct. 1141, (2012)). The court went further to contrast the case before it with an example more like the one presented here, where a plaintiff alleges "that the defendant debt

collector lawyer routinely files collection complaints containing intentionally false assertions of the amount owed, serves the complaints on unrepresented consumers, and then dismisses any complaint that is not defaulted." *Id.* at 818. As the court recognized, such a case would "raise far different issues of abusive, deceptive, or unfair means of debt collection." *Id.* at 818 (citing *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 947 (9th Cir. 2011)).[5]

*Henningsen* may be helpful in deciding whether evidence in an FDCPA case sufficiently supports a claim alleging false or deceptive statements, a issue not yet before this Court, but *Henningsen* does not support Defendants' invocation of the *Noerr-Pennington* doctrine. *See also Austin v. Frederick J. Hanna & Assocs., P.C.*, No. 1:14–CV–00561–SCJ–JF, 2014 WL 4724885, at *6 (N.D. Ga. July 10, 2014) (King, Mag. J.) ("The decision in *Hemmingsen* does not stand for the proposition that attorneys posses a first amendment litigation immunity against all law suits brought by debtors pursuant to the FDCPA but that, as determined on a case-by-case basis, litigation conduct may not offend the FDCPA."), *adopted*, (N.D. Ga. Dec. 23, 2014) (Jones, J.). Similarly, after providing an expansive holding regarding the scope of litigation activities subject to the FDCPA, the Eleventh Circuit in *Miljkovic* found that the particular facts set forth by Plaintiff did not state a claim for relief. *Miljkovic*, 2015 WL 3956570.

---

[5] In *McCollough*, the Ninth Circuit rejected out of hand a law firm's contention that the FDCPA should not be read to cover discovery procedures. *McCollough*, 637 F.3d 939, 950-51 (9th Cir. 2011). The court explained, and the law firm conceded, that the FDCPA covers the filing of complaints and the service of settlement letters, so it would be an artificial distinction unsupported by precedent to hold that the FDCPA does not apply to other aspects of litigation. *Id.* at 951.

For these reasons, the Court rejects Defendants' First Amendment/*Noerr Pennington* argument.

### 2. *Equal Protection Clause*

Defendants next argue that the Fifth Amendment's Equal Protection Clause prohibits the Bureau from imposing upon the Firm and its clients "requirements on the bringing of debt collection lawsuits not applicable to other kinds of litigants." (Mot. Dismiss at 36.) Defendants argue that their clients have a fundamental right to access to the courts, and thus the Court should apply strict scrutiny to the Bureau's claims which have the effect of burdening this right.[6] The question Defendants present is therefore whether the Bureau's action against the Firm limits its creditor-clients' access to the courts in any constitutionally significant way. The Court concludes that it does not.[7]

Defendants' equal protection claim fails right out of the gate because they erroneously suggest that the Court should apply strict scrutiny in a knee-jerk fashion the moment one's ability to access the courts is infringed in any manner. On the contrary, "[w]hen a claim involves a right not entitled to special

---

[6] *See Romer v. Evans*, 517 U.S. 620, 631-32 (1996) (explaining the levels of review applicable to equal protection claims).

[7] To be clear, the potential fundamental right Defendants invoke here, the right to access the courts, belongs to the Firm's clients, not the Firm itself. The only right of its own that the Firm seeks to protect is the right to represent these clients — i.e., the right to practice law. But as the Bureau correctly notes, the right to practice law is unquestionably not a fundamental right. *See Schwartz v. Kogan*, 132 F.3d 1387, 1391 n.2 (11th Cir. 1998) ("[T]his Circuit has indicated that there is no fundamental right to practice law . . . ."). And Defendants do not argue that the Bureau lacks a rational basis for enforcing the FDCPA and CFPA. The Bureau does not question Defendants' standing to bring an equal protection challenge. *See also Warth v. Seldin*, 422 U.S. 490, 510 (1975) ("In several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.") (citing, among others, *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965)).

constitutional protection, access to the courts may be hindered if there is a rational basis for so doing." *Woods v. Holy Cross Hosp.*, 591 F.2d 1164, 1174 (5th Cir. 1979) (citing among others, *United States v. Kras*, 409 U.S. 434 (1973)) (holding that Florida is free to require pre-suit mediation for any medical malpractice case).[8] Thus for example in *Boddie v. Connecticut*, the case that gave birth to the fundamental right of access to the courts, the Supreme Court held that states could not limit access to the courts for one seeking divorce, stressing that the state had a monopoly on the means to legally dissolve the "fundamental human relationship" of marriage. *Boddie v. Connecticut*, 401 U.S. 371, 382-83 (1971).

The Supreme Court came out the other way in *United States v. Kras*, a case in which a debtor challenged bankruptcy court fees. *United States v. Kras*, 409 U.S. 434, 445 (1973). The Court reasoned that unlike the fundamental interests at stake in *Boddie*, the "alleged interest in the elimination of [the appellant's] debt burden, and in obtaining his desired new start in life, although important and so recognized by the enactment of the Bankruptcy Act, does not rise to the same constitutional level." *Id.* The Court further noted that, unlike in *Boddie*, the debtor in *Kras* was free to "enter into and rescind commercial contracts." *Id.*

> However unrealistic the remedy may be in a particular situation, a debtor, in theory, and often in actuality, may adjust his debts by negotiated agreement with his creditors. At times the happy passage of the applicable limitation period, or other acceptable creditor

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

> arrangement, will provide the answer.  Government's role with respect to the private commercial relationship is qualitatively and quantitatively different from its role in the establishment, enforcement, and dissolution of marriage.

*Id.* at 445-46; *see also Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458 (1988) (states may allow some local school boards but not others to assess a fee for transporting students from home to public school).

The right at issue here is the Firm's creditor clients' right to go to court to recover on their loans.  This right is no more constitutionally significant than the right of a debtor to go to court to discharge his debt — indeed, it is essentially the same right viewed from the creditor's perspective.  The Firm's clients "in theory, and often in actuality, may adjust [the] debts by negotiated agreement with [their debtors]." *Kras*, 409 U.S. at 445-56.  Thus, there is no fundamental right at stake here that triggers strict scrutiny.  And as noted, Defendants make no argument that the Bureau's enforcement of the FDCPA and CFPA would not survive rational basis review.[9]   Accordingly, the Court rejects Defendants equal protection defense.

### C.   Meaningful Attorney Involvement

#### 1.   FDCPA

The Bureau alleges that the Firm's practice of filing debt collection lawsuits without any meaningful involvement by an attorney violates 15 U.S.C. § 1692e. Under § 1692e, "[a] debt collector may not use any false, deceptive, or misleading

---

[9] Moreover, Defendants offer no facts to suggest that the Bureau's action here would impede, in any meaningful way, their creditor-clients from bringing any nonfrivolous legal claims.

representation or means in connection with the collection of any debt." The statute then provides several examples of false, deceptive, or misleading representations or means, expressly noting that these examples are not meant to "limit[] the general application" of 1692e. The Bureau argues that the filing of a lawsuit, signed by an attorney but without meaningful attorney involvement, violates § 1692e(3), which prohibits "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). The Bureau also alleges in its Complaint that the Firm's practice of filing complaints without meaningful attorney involvement violates § 1692e(10), which prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. § 1692e(10).

Under the broadly construed terms of § 1692e(3), the Bureau states an FDCPA claim based on the attorneys' alleged lack of meaningful involvement in the filing of the Georgia Collection Suits. Consistent with the practice of broadly construing remedial consumer protection statutes in favor of the consumer, courts have routinely held that a "communication" that is literally from an attorney (in the sense that it may be signed by an attorney or comes from her office) may still violate § 1692e(3) if the attorney was not meaningfully involved in drafting the communication. *See, e.g.*, *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993); *Avila v. Rubin*, 84 F.3d 222, 228 (7th Cir. 1996); *Gonzales v. Kay*, 577 F.3d 600, 604 (5th Cir. 2009); *Lesher v. Law Offices of Mitchell*, 650 F.3d 993,

1003 (3d Cir. 2011); *Dalton v. FMA Enterp., Inc.*, 953 F. Supp. 1525 (M.D. Fla. 1997).

In *Clomon*, for example, the Second Circuit held that a lawyer violated the § 1692e(3) when he "authorized the sending of debt collection letters bearing his name and a facsimile of his signature without first reviewing the collection letters or the files of the persons to whom the letters were sent." *Clomon*, 988 F.2d at 1316. The court reasoned that the use of the attorney's signature had the potential to mislead the least sophisticated consumer — the standard also applied in the Eleventh Circuit. *Id.* at 1321.[10] The court explained how a consumer could be misled by this practice.

> [T]he use of an attorney's signature on a collection letter implies that the letter is "from" the attorney who signed it; it implies, in other words, that the attorney directly controlled or supervised the process through which the letter was sent. We have also found here that the use of an attorney's signature implies — at least in the absence of language to the contrary — that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent. In a mass mailing, these implications are frequently false: the attorney whose signature is used might play no role either in sending the letters or in determining who should receive them.

*Id.* "In short," the court explained, "the fact that [the lawyer] played virtually no day-to-day role in the debt collection process supports the conclusion that the collection letters were not 'from' [the lawyer] in any meaningful sense of that

---

[10] *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1193-94 (11th Cir. 2010) ("We employ the "least-sophisticated consumer" standard to evaluate whether a debt collector's communication violates § 1692e of the FDCPA.").

word.  Consequently, the facts of this case establish a violation of subsection (3) of § 1692e." *Id.* at 1320.

Several circuit courts and many district courts in this circuit have adopted and expanded on this "meaningful involvement" doctrine for determining whether a debt-collection lawyer violates § 1692e(3) in his communications. *See, e.g.*, *Avila*, 84 F.3d at 228-29 (holding that an attorney with "no real involvement in the mailing of dunning letters" violates the § 1692e(3) when he mechanically reproduces his signature on such debt collection letters because the attorney had "no real involvement in the mailing" of such letters, and thus the letters were "not 'really' from an attorney in any meaningful sense of the word"); *Gonzales v. Kay*, 577 F.3d 600, 605 (5th Cir. 2009) (reversing dismissal of a complaint alleging that unsigned dunning letters on attorney letterhead in which the attorney had no meaningful involvement violate the FDCPA despite a disclaimer on the back of the letter because "the 'least sophisticated consumer' reading this letter might be deceived into thinking that a lawyer was involved in the debt collection"); *Lesher*, 650 F.3d at 1003 (applying the meaningful attorney involvement doctrine to affirm denial of summary judgment where a law firm notified the debtor on law firm letterhead that its "office" is handling the debtor's account, despite a disclaimer on the back of the letter);  *Dalton v. FMA Enterp., Inc.*, 953 F. Supp. 1525 (M.D. Fla. 1997) (adopting the meaningful attorney involvement doctrine in denying a lawyer's motion for summary judgment, holding that a question of fact existed whether the lawyer was meaningfully involved in the sending of a

dunning letter when the lawyer "reviewed debtors' names, original balances, current balances and statuses of the accounts recommended for legal review, client codes, and file numbers").

In *Avila*, the Seventh Circuit explained the relevant concern motivating the meaningful attorney doctrine.  "An unsophisticated consumer, getting a letter from an 'attorney,' knows the price of poker has just gone up," the court reasoned.  *Avila*, 84 F.3d at 229.  "And that clearly is the reason why the dunning campaign escalates from the collection agency, which might not strike fear in the heart of the consumer, to the attorney, who is better positioned to get the debtor's knees knocking."  *Id.*; *see also Gonzales*, 577 F.3d at 605 ("A letter from a lawyer implies that the lawyer has become involved in the debt collection process, and the fear of a lawsuit is likely to intimidate most consumers.").

To go further, several district courts have applied this meaningful attorney involvement doctrine to an FDCPA claim such as the one presented here premised on the filing of a lawsuit without meaningful attorney involvement. *See, e.g.*, *Bock v. Pressler & Pressler, LLP*, 30 F. Supp. 3d 283, 293 (D.N.J. 2014); *Tourgeman v. Collins Fin. Servs. Inc.*, No. 08-cv-1392 JLS (NLS), 2011 WL 3176453, at * (S.D. Calif. July 26, 2011), *reversed on other grounds*, 755 F.3d 1109 (9th Cir. 2014) (suggesting that the district court correctly applied the meaningful involvement doctrine); *see also Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920(ERK), 2012 WL 661456, at *12-13 (E.D.N.Y. Feb. 28, 2012) (recommending denying a motion to dismiss a similar FDCPA claim), *adopted*

*by*, 2012 WL 1882976 (E.D.N.Y. May 24, 2012); *Berg v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 07 C 4887, 2009 WL 901011, at *12 (N.D. Ill. Mar. 31, 2009); *Miller v. Upton, Cohen & Slamowitz*, 687 F. Supp. 2d 86, 100 (E.D.N.Y. 2009) (concluding that a law firm "mass-produced" debt collection and litigation documents "at the push of a button" and thus holding that the firm was liable under § 1692e). *But see Taylor v. Quall*, 471 F. Supp. 2d 1053, 1061-62 (C.D. Calif. 2007) (stating that there is no "general standard under the FDCPA for adequate attorney involvement in debt collection actions" and suggesting that the meaningful attorney involvement analysis should be limited to cases involving "the mass mailing of collection letters containing the signatures of attorneys who never reviewed the involved debtors' individual files"). These courts simply recognize that § 1692e(3) and the associated meaningful attorney involvement doctrine apply to "communications" that are ostensibly from an attorney, and a collection complaint is a "communication" as that term is defined under the FDCPA. *Bock*, 30 F. Supp. 3d at 291.

Defendants do not argue that a complaint filed in court is somehow not a communication under § 1692e, nor could they. The FDCPA broadly defines the term "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). And other subsections of the FDCPA solidify that, absent an exclusion, a legal pleading is a communication. For example, 15 U.S.C. § 1692e(11) requires debt collectors to disclose certain information in an initial written communication, but

expressly provides that this requirement "shall not apply to a formal pleading made in connection with a legal action."  If a formal pleading were not otherwise considered a communication, this exception would be superfluous.  *See Miljkovic* 2015 WL 3956570 at *5 (holding that "Congress  did not otherwise constrain the Act's general applicability to lawyers using litigation to collect debts" when it amended § 1692e(11) and exempted formal pleadings from the particularized FDCPA requirement that the communication comes from a debt-collector); *Goldman v. Cohen*, 445 F.3d 152, 156 (2d Cir. 2006) ("[T]his section's express exclusion of a legal pleading from the scope of the term 'communication' implies the drafters' understanding that the term 'communication' would otherwise include legal pleadings.") (quoting *Goldman v. Cohen*, No. 01 Civ. 5952(LMM), 2004 WL 2937793, at *2 (Dec. 17, 2004)); *see also United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015) ("[W]hen [courts] engage in statutory interpretation, '[i]t is our duty to give effect, if possible, to every clause and word of a clause.'") (citing *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  Likewise, a 2006 amendment to the FDCPA applicable to § 1692g(a) provides that "[a] communication in the form of a formal pleading in a civil action shall not be treated as an initial communication."  15 U.S.C. § 1692g(d).  Thus, considering the statute as a whole, a complaint filed in court may constitute a communication for purposes of § 1692e.  *See also Miljkovic*, 2015 WL 3956570, at *9 ("Interpreting the FDCPA to permit otherwise prohibited conduct merely because it . . . takes the form of a procedural filing would not only subvert the plain text of

the Act, it would also frustrate the Act's stated objectives."); *Thomas v. Simpson & Cybak*, 392 F.3d 914 (7th Cir. 2004) (en banc) (holding that the plain language of the statute provides that a summons and complaint is a "communication" under the FDCPA), *superseded on other grounds by state statute as recognized in Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 472-73 (7th Cir. 2007); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1031-32 (9th Cir. 2010).

Instead of arguing that a complaint is not a communication, Defendants make four interrelated arguments, none of which adequately support their Motion to Dismiss.  First, Defendants argue that the court-made "meaningful attorney involvement" doctrine — which is not codified in the FDCPA — should not be extended to pleadings because a different set of concerns are involved when dealing with dunning letters.  According to Defendants, "[c]ourts have uniformly rationalized 'a meaningful involvement' requirement for attorney collection letters on the basis that "[a] letter from a lawyer implies that the lawyer has become involved in the debt collection process, and the fear of a lawsuit is likely to intimidate most consumers."  (Mot. Dismiss at 16 (quoting *Gonzales*, 577 F.3d at 604).)  Defendants argue that this same rationale does not apply to complaints actually filed with a court.  (*Id.* at 17.)  In this case, on the other hand, a lawsuit has already commenced and thus the stakes have already been raised.

Thus, according to Defendants, "the filing of a lawsuit *truthfully* informs consumers that they are named as defendants in a lawsuit." (*Id.* at 17-18.)[11]

The Court rejects Defendants' argument for two reasons. First, Defendants mischaracterize the reasoning of the cases cited above when they suggest that the sole driving force behind the meaningful attorney involvement doctrine is the imminence of a lawsuit. This is too narrow a view of the rationale behind the meaningful attorney involvement doctrine. The main concern in these cases is more generally that a communication signed by a lawyer but without meaningful attorney involvement falsely leads the consumer to believe that a lawyer has reviewed the debtor's account and assessed the validity of the creditor's position. *See Clomon*, 988 F.2d at 1320-21 ("In short, the collection letters would have led many consumers, and certainly the least sophisticated consumer, to believe that an attorney had personally considered the debtor's case before the letters were sent."); *Avila*, 84 F.3d at 229 ("A letter from an attorney implies that a real lawyer, acting like a lawyer usually acts, directly controlled or supervised the process through which the letter was sent. A debt collection letter on an attorney's letterhead conveys authority."); *See Gonzales*, 577 F.3d at 604 ("A

---

[11] In addition, under Georgia law, the signing of a pleading certifies only that the attorney "has read the pleading and that it's not interposed for delay." O.C.G.A. § 9-11-11; *c.f.* Fed. R. Civ. P. 11 (providing that in federal court, an attorney's signature on a pleading certifies that the attorney has conducted "an inquiry reasonable under the circumstances" and based upon that inquiry, the attorney can say to the best of her knowledge, information and belief that the claims are warranted by existing law"). The Complaint suggests that the attorneys at most skimmed the debt collection pleadings. Nonetheless, to the extent skimming counts as reading, one could argue that, as alleged in the Complaint, the Georgia Collection Suits truthfully informed the consumer that an attorney "has read the pleading" — but did not necessarily, as suggested by the filing, make a determination that the claims were warranted by existing law.

letter from a lawyer implies that the lawyer has become involved in the debt collection process, *and* the fear of a lawsuit is likely to intimidate most consumers.") (emphasis added).   In other words, "consumers are inclined to more quickly react to an attorney's threat than to one coming from a debt collection agency."   *Avila*, 84 F.3d at 229.

The same is equally if not more true for consumers who are served with an actual, debt collection lawsuit.   The least sophisticated consumer is likely to believe when served with a debt collection complaint that a lawyer has reviewed his account and determined that the creditor has a valid claim.   (Arguably, even a more sophisticated consumer would come to this same conclusion, unless of course the consumer is aware that the law firm who filed the complaint runs a litigation-mill without any meaningful attorney involvement.)   In *Avila*, the Seventh Circuit held that "if a debt collector (attorney or otherwise) wants to take advantage of the special connotation of the word 'attorney' in the minds of delinquent consumer debtors to better effect collection of the debt, the debt collector should at least ensure that an attorney has become professionally involved in the debtor's file."   *Avila*, 84 F.3d at 229; *see also Tourgeman*, 755 F.3d at 1123 ("Furthermore, a consumer could be harmed by a complaint — as opposed to a dunning letter — in ways distinct yet equally problematic as those we have already discussed.   For example, the consumer who engages legal counsel might be unable to accurately apprise the lawyer of the relevant circumstances, potentially leading to lost opportunities to settle the debt.   And

the stakes are undoubtedly higher when the consumer faces the possibility of a default judgment rather than the mere continuation of collection attempts.").

Likewise, if an attorney wants to take advantage of the fear that serving a complaint would inspire in a debtor, the lawyer should at the very least ensure that he has become professionally involved in the decision to file the lawsuit. So while it is true that the stakes have already been raised when a debtor has been served with a debt-collection complaint, if that complaint has had no meaningful attorney oversight, then there is a real possibility that it is legally or factually untenable. In other words, a reasonable inference to draw from the Bureau's allegations is that a consumer faced with a debt collection lawsuit filed by the Firm would view the complaint as a legally valid statement of the consumer's obligation because the complaint was purportedly prepared by counsel. It is thus plausible that such consumers would therefore effectively be coerced into paying a debt that they may or may not actually owe or doing the same through default. (Compl. ¶¶ 21-22.) As such, the Bureau plausibly alleges a violation of the FDCPA.

Second, § 1692e prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt." The example provided in § 1692e(3) regarding attorney communications — and courts' interpretation of this example — is simply meant to give courts a sense of the type of misleading representations that are prohibited. *See Clomon*, 988 F.2d at 1320 ("[T]he use of *any* false, deceptive, or misleading representation in a

collection letter violates § 1692e — regardless of whether the representation in question violates a particular subsection of that provision."). The Bureau also alleges that the Firm's litigation-mill conduct violates § 1692e(10), the catch-all prohibition against "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. § 1692e(10). While it is true that a "catch-all is not a free-for-all," *Miljkovic*, 2015 WL 3956570, at *14 (discussing 15 U.S.C. § 1692f), the catch-all provision and § 1692e as whole grant courts the flexibility "to proscribe other improper conduct which is not specifically addressed" in the enumerated examples. *See* S. Rep. No. 95–382, at 4 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1698. Interpreting the meaningful attorney involvement doctrine to include complaints that are generated on a mass basis, as if dunning letters, without meaningful attorney investigation or review, is thus consistent with the remedial nature of the FDCPA. *See Miljkovic*, 2015 WL 3956570, at *9-10.[12]

Defendants next assert that there is no meaningful attorney involvement standard for complaints and thus the Court should not fashion one here. Defendants are generally correct that there is no specific "standard" for assessing

---

[12] *See also Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006) ("Because the FDCPA is a remedial statute, *Hamilton v. United Healthcare of La.*, 310 F.3d 385, 392 (5th Cir. 2002), [courts] construe its language broadly, so as to effect its purpose, *See Stroh v. Director, OWCP*, 810 F.2d 61, 63 (3d Cir. 1987)."); *Travis v. Trust Co. Bank*, 621 F.2d 148, 150-51 (5th Cir. 1980) (recognizing that due to the statute's remedial purpose, the Truth in Lending Act should be "liberally and broadly construed in favor of the consumer"); *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) (recognizing that remedial statutes such as the Fair Labor Standards Act should be construed broadly); *see, e.g.*, *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1259-60 (11th Cir. 2014) (broadly interpreting what constitutes a deceptive practice under the FDCPA); *Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 923-24 (11th Cir. 1997) (broadly defining the term "debt" as used in the FDCPA).

meaningful attorney involvement for complaints.  But neither is there such a specific standard applicable to dunning letters.  Instead, "whether an attorney's lack of meaningful involvement in the collections process violates the FDCPA depends on the facts and circumstances of the individual case."  *Tourgeman*, 2011 WL 3176453, at *9; *see also Taylor v. Quall*, 471 F. Supp. 2d 1053, 1061-62 (C.D. Calif. 2007) (stating on summary judgment that there is no "general standard under the FDCPA for adequate attorney involvement in debt collection actions" and instead, courts consider whether the circumstance of the particular case result in a violation under § 1692e).  In other words, in the Eleventh Circuit, the court or the jury applies the least sophisticated consumer standard to determine whether the routine filing of complaints with a lack of substantive attorney involvement constitutes a misleading or deceptive debt collection practice.  *See LeBlanc v. Unifund CCR Partners, G.P.*, 601 F.3d 1185, 1193-94 (11th Cir. 2010) ("We employ the 'least-sophisticated consumer' standard to evaluate whether a debt collector's communication violates § 1692e of the FDCPA."), *reversing on other grounds LeBlanc v. Unifund CCR Partners, G.P.*, 552 F. Supp. 2d 1327, 1335-36 (M.D. Fla. 2008) (applying the least sophisticated consumer standard to a § 1692e(3) claim).  Perhaps the facts of this case will suggest that the debt collection complaints' drafting involved sufficient attorney oversight such that the filing of the complaint was not misleading to the least sophisticated consumer.  But at this stage of litigation, it is plausible, especially given the Bureau's pre-suit investigation, that the least sophisticated consumer

would be misled by the Firm's complaints — which allegedly utilized no more than one minute of a lawyer's time, spent skimming the pleading for grammar and spelling errors.

Third, Defendants argue that applying a "non-existent" standard would render the FDCPA void for vagueness.  If Defendants' argument were correct, then any application of the least sophisticated consumer standard to novel factual circumstances would likewise render the § 1692e void for vagueness.  That can't be right.  Defendants cite no case voiding any application of the least sophisticated consumer standard as unconstitutionally vague.  Indeed, the hurdle for a civil statute to overcome in the face of a vagueness challenge is quite low. "[A] civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'"  *Leib v. Hillsborough Cnty. Public Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009).[13]  The challenged statute need not be precise.  "[A]ll that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding."  *Id.* (quoting *This That and The Other Gift & Tobacco, Inc. v. Cobb County, Ga.*, 285 F.3d 1319, 1325 (11th Cir. 2002)).  Here, lawyers certainly have a "common understanding" that only skimming a complaint for typographical errors — as alleged in the Complaint — is not the same as being

---

[13] Defendants argue that the Court should subject the FDCPA claims here to stricter vagueness test because the law "'threatens to inhibit the exercise of constitutionally protected rights' such as the First Amendment right to petition courts for redress."  (Mot. Dismiss at 20 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).)  For the reasons discussed above in Part III.B.2, Defendants are wrong that a fundamental right is implicated in this case.

meaningfully involved in the review of the client's claims and drafting of the complaint. *See id.* Thus, the Court rejects Defendants' vagueness argument. *C.f. Illinois v. Alta Colleges, Inc.*, No. 1:14-cv-3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) (holding that, as an economic regulation, the CFPA's prohibition against "unfair" and "abusive" practices "is subject to a lenient vagueness test" and under this test, the CFPA is not unconstitutionally vague); *Consumer Fin. Protection Bur. v. ITT Educ. Servs., Inc.*, --- F. Supp. 3d ---, No. 1:14-cv-0292-SEB-TAB, 2015 WL 1013508, at *17-18 (S.D. Ind. Mar. 6, 2015) (likewise declining to apply heightened scrutiny and rejecting the argument that the CFPA's prohibition on "any unfair . . . act or practice" is "standardless").[14]

Finally, Defendants reassert that the "obvious reason" for rejecting the Bureau's § 1692e(3) claim based on a lack of meaningful attorney involvement is that the regulation of the practice of law should be left to the states. As the Court discusses above in Part III.A, while generally states regulate the practice of law, the FDCPA unquestionably applies to debt-collection lawyers engaged in litigation activity. *Heintz*, 514 U.S. at 295-96; *Miljkovic*, 2015 WL 3956570, at *4-10; *see also Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 451 (6th Cir. 2014) (holding that a lawyer debt-collector violates the FDCPA by asserting a false representation regarding the character or amount of the debt, under § 1692e(2), even when such false statements are made in a legal complaint filed in court); *c.f. Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1261-62

---

[14] Defendants raise this same vagueness challenge regarding the alleged CFPA violation, and for the same reasons above, the Court rejects this challenge.

(11th Cir. 2014) (holding §§ 1692e and 1692f apply to a debt collector's stale proof of claim filed in bankruptcy court); *Doyle*, 695 S.E.2d at 616 ("The application of the FTCA to attorneys collecting consumer debt is by way of the FDCPA, a separate act which expressly addresses debt collection and applies to attorneys only because of the repeal of a prior exemption for them.").

In sum, a reasonable inference one can draw from the Bureau's allegations is that the Firm files lawsuits on a massive scale, not based on any legal determination that each lawsuit is warranted, but instead as an extension or replacement of dunning letters, to scare debtors into paying up.  The least sophisticated consumer could view a lawsuit, signed by an attorney, as an indication that a lawyer had in fact scrutinized the case and determined that it had legal merit.  In this way, the Firm's alleged litigation-mill may plausibly violate § 1692e.

### 2.   *CFPA*

Defendants next argue that even if true, the Complaint does not state a claim under the CFPA for allegedly deceptive acts or practices based on the allegation that the Firm's attorneys sign complaints filed in court even though they were not "meaningfully involved."

The CFPA prohibits "any unfair, deceptive, or abusive act or practice."[15]  12 U.S.C. § 5536(a)(1)(B).  The parties agree that the standard for a CFPA deception

---

[15] The Bureau also notes that a violation of the FDCPA constitutes a violation of the CFPA under § 5536(a)(1)(A), which provides that it is unlawful for a covered service provider to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer

claim under this section is the same as the standard under § 5(a) of Federal Trade Commission Act ("FTCA" or "FTC Act"), which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).  (*See* Mot. Dismiss at 24-25; Resp. at 24 n.62.); *see also Illinois v. Alta Colleges*, No. 1:14-cv-3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) ("The statute does not define a 'deceptive' practice, but the Bureau says the phrase has the same meaning under the CFPA as it does under the Federal Trade Commission Act . . . .").  "To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citing 15 U.S.C. § 45(a)).

Defendants assert that "no consumer reacting reasonably to a complaint filed by an FJ Hanna attorney could be misled with respect to whether his or her purported creditor had initiated a lawsuit to collect a debt."  (Mot. Dismiss at 25, Doc. 20.)  Defendants then argue that even if these debt-collection complaints misrepresented the level of attorney involvement, this misrepresentation "would have been immaterial because whether or not an attorney was meaningfully involved in preparing the complaint, the reality remained that the consumer had

---

financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law."  12 U.S.C. § 5536(a)(1)(A).  Defendants do not separately challenge this theory of liability, except to the extent they move to dismiss the Bureau's FDCPA claims themselves.

become the subject of a civil lawsuit filed by FJ Hanna on behalf of its client."
(*Id.*)

It is true that, according to the Complaint, the Firm's litigation practice did not mislead consumers regarding whether they are defendants in a lawsuit; once the case was filed, the consumers were obviously defendants in a lawsuit. But this is not the basis of the Bureau's claim. Instead, as discussed above, the Complaint plausibly alleges that the Firm's litigation practice misled consumers acting reasonably under the circumstances that a lawyer has reviewed the consumer's file and determined that it validly merits litigation. The Court therefore rejects Defendants' Motion to Dismiss the CFPA claim premised on the alleged massive filing of debt-collection complaints without meaningful attorney involvement.

### D.    Use of Affidavits

The Bureau's second basis for its FDCPA and CFPA claims is premised on the Firm's alleged use of affidavits when the Firm knew or should have known that the affiant had no personal knowledge of some of the material facts in the affidavit (collectively, the "Affidavit Claims"). According to the Bureau, for those affidavits received from its debt-buyer clients (as opposed to its creditor clients), the Firm allegedly "did not determine whether any underlying documentation for the debt was available." (Compl. ¶ 24.) The Firm also allegedly failed to "review the contracts governing the sale of accounts to determine whether those contracts disclaimed any warranties regarding the accuracy or validity of the debts." (*Id.*

¶ 24.)  The Bureau alleges that this sloppy affidavit practice violated the following sections of the FDCPA and CFPA:

- FDCPA, 15 U.S.C. § 1692e(2)(A) (prohibiting the "false representation of . . . the character, amount, or legal status of any debt");

- FDCPA, 15 U.S.C. § 1692e(10) (prohibiting "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer");

- FDCPA, 15 U.S.C. § 1692f ("A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.");

- CFPA, 12 U.S.C. § 5536(a)(1)(A) ("It shall be unlawful for . . . any covered person or service provider . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law[.]");

- CFPA, 12 U.S.C. § 5536(a)(1)(B) (prohibiting "any unfair, deceptive, or abusive act or practice").[16]

(*See* Compl. Counts III & IV (the "Affidavit Claims").)

Defendants move to dismiss the Affidavit Claims, asserting essentially two arguments.  First, Defendants argue that Rule 9's heightened pleading standard should apply to these claims and that the Bureau has failed to meet that level of specificity.  Second, Defendant argues that these claims fail even under the more lax notice pleading standard of Rule 8 because the Bureau did not allege any facts upon which the Court could infer that the affiants actually lacked personal knowledge of the debts or that Defendants knew or should have known that.  The

---

[16] The Bureau also invokes 12 U.S.C. § 5531(a) which simply authorizes the Bureau to "take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service."

Court rejects these arguments.   The allegations in the Complaint support the plausible inference that on a number of occasions, the affidavits were themselves false or misleading in violation of the FDCPA and CFPA.

### 1.   *Rule 9(b)*

Defendants first contend that Rule 9(b) should apply to the Bureau's Affidavit Claims.   Defendants readily admit the Eleventh Circuit has not addressed whether Rule 9(b) applies to FDCPA allegations.  (Mot. Dismiss at 26.) In fact, apparently no circuit court has decided whether and to what extent Rule 9(b) applies to claims under §§ 1692e or 1692f.  And, as far as the Court can tell, no circuit court or district court has held that Rule 9(b) applies to claims under the CFPA either.

However, in 2005, the Tenth Circuit concluded that Rule 9(b) does not apply to claims brought under § 5(a) of the FTC Act — claims which are analyzed in the same manner as those brought under § 1692e of the FDCPA and § 5536(a)(1)(B) of the CFPA.  *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005); *see Jeter*, 760 F.2d at 1174 (analogizing claims under the FDCPA to claims under § 5 of the FTCA).  The Tenth Circuit reasoned that "[a] § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)."  *Id.*  "Unlike the elements of common law fraud," the court explained, "the FTC need not prove scienter, reliance, or injury to establish a § 5 violation."  *Freecom*, 401 F.3d at 1204 n.7.

District courts are split as to whether Rule 9(b) should apply to claims alleging deceptive means to collect debts, but several apply reasoning similar to the Tenth Circuit's in *Freecom.* *Compare Neild v. Wolpoff & Abramson, LLP*, 453 F. Supp. 2d 918, 923-24 (E.D. Va. 2006) (collecting cases and deciding that the gravamen of a § 1692e violation is not fraud so Rule 9(b) does not apply), *and Sullivan v. Equifax, Inc.*, No. CIV. a. 01-4336, 2002 WL 799856, at *3 (E.D. Pa. Apr. 19, 2002) (noting that § 1692e(8) has no requirement that the elements of fraud are satisfied and recognizing that "courts considering the issue have invariably determined the sufficiency of FDCPA pleadings by applying Rule 8 rather than Rule 9(b)") (collecting cases), *with Dickman v. Kimball, Tirey & St. John, LLP*, 982 F. Supp. 2d 1157, 1165-66 (S.D. Cal. 2013) (applying Rule 9(b) to the aspects of the plaintiff's FDCPA claim the court considered fraudulent in nature), *and Kupferstein v. RCS Ctr. Corp.*, No. 03-cv-1497, 2004 WL 3090582, at *2 (E.D.N.Y. Aug. 11, 2004) (applying Rule 9(b) to an FDCPA claim without explaining why); *see also Thompson v. Resurgent Capital Servs., LP*, No. (N.D. Ala. Mar. 31, 2015) (collecting district court cases demonstrating a split and noting that no federal court of appeals has decided whether and to what extent Rule 9(b) applies to FDCPA claims under §§ 1692e or 1692f).[17]

---

[17] To the extent Rule 9(b) might apply at all, it would only apply to claims under the FDCPA and CFPA that have a fraud dimension to them. *See, e.g., Cutler ex rel. Jay v. Sallie Mae, Inc.*, No. EDCV–13–2142–MWF (DTBx), 2014 WL 7745878, at *3 (C.D. Calif. Sept. 9, 2014). In *Cutler*, for example, the court rejected the notion that Rule 9(b) should be applied to FDCPA claims alleging harassing conduct. *Id.* "While certain sections of the FDCPA may be violated only on a showing of false or misleading communications, which must be pled with particularity under Rule 9(b)," the court reasoned, "a plaintiff may plead a harassing, oppressive, abusive, unfair, or unconscionable communication without any allegations of fraud or mistake. These allegations,

The few cases applying the heightened pleading standard of Rule 9(b) to FDCPA claims are unpersuasive.  The Bureau's consumer protection claims here are not subject to Rule 9(b).  First, Rule 9(b) expressly applies only to claims alleging "fraud or mistake," and as the Tenth Circuit and several district courts have reasoned, consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them.  *C.f. Miller Pipeline Corp. v. British Gas PLC*, 69 F. Supp. 2d 1129, 1135 (S.D. Ind. 1999) (applying Rule 9(b) to a "Walker Process" claim, a claim that a patent applicant committed fraud on the patent office, which is essentially indistinguishable from a common law fraud claim).  Unlike a fraud claim, the FDCPA "does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute."  *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (citing *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010)).

Second, the United States Supreme Court has consistently cautioned against extending this heightened pleading standard beyond claims for fraud or mistake.  For example, in *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1997), the Court held that civil rights plaintiffs do not need to satisfy heightened pleading standards to state a claim for municipal liability under 42 U.S.C. § 1983.  The Court noted that "Rule 9(b) does impose a particularity requirement in two specific instances."  *Id.*  But because the Rule expressly noted that this particularity requirement applied to claims of

---

then, need not meet the heightened pleading standard of Rule 9(b)."  *Id.*  Defendant does not seem to contend that Rule 9(b) should apply to any claim other than the deception claims.

fraud or mistake, and the rules "do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983," the heightened pleading standard did not apply. *Id.* ("Expressio unius est exclusio alterius.");[18] *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (declining to extend heightened pleading requirements to employment discrimination claims). Admittedly, a claim under the FDCPA or CFPA alleging a misrepresentation is more similar to a claim of fraud than civil rights or employment discrimination claims. But the Court is wary of extending Rule 9(b)'s heightened pleading standard, especially in the context of an explicitly protective consumer statute intended to protect the "least sophisticated consumer," absent clear authority to do so. And as noted, no circuit court has extended Rule 9(b) to consumer protection claims.

Finally, applying a heightened pleading standard to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes. Six main reasons justify the heightened pleading standard applicable to fraud claims. Wright & Miller, Federal Practice & Procedure, § 1296: Pleading the Circumstances of Fraud or Mistake — History and Purpose. These include:

> (1) "safeguard[ing] potential defendants from lightly made claims charging the commission of acts that involve some degree of moral turpitude";

---

[18] The only change in Rule 9(b) since this Supreme Court ruling was purely "stylistic" and not meant to change the substance of the Rule. *See* Fed. R. Civ. P. 9, 2007 Amendment note.

(2) minimizing the potential for unfounded "nuisance" claims;

(3) limiting fraud claims to those in which the "alleged injustice is severe enough to warrant the risks and difficulties inherent in a re-examination of old and settled matters," which is often the goal of fraud claims;

(4) deterring suits designed solely for discovery purposes;

(5) enabling defendants to fully understand the allegation so they can craft an adequate response; and

(6) minimizing fraud suits generally, which are "disfavored."

*Id.*

Many of these concerns do not apply at all, or their application is minimized in the context of a consumer protection claim. For example, reason number 3 — limiting the reopening of old and settled matters to only where justice so requires — is not a concern in an FDCPA or CFPA case like this one which seeks monetary penalties and injunctive relief but does not seek to reopen any matter. Consumer protection claims are not disfavored so reason number 6 is inapplicable. Reasons numbers 2 and 4 (minimizing nuisance suits and deterring suits designed solely for discovery purposes) are equally applicable to any lawsuit, but Congress has never expressed a concern about consumers harassing debt collectors. The relevant goal of these consumer protection laws is exactly the opposite: to reduce debt collectors' harassment of consumers.

Moreover, imposing a heightened pleading standard to claims under the FDCPA and CFPA would be inconsistent with the general remedial nature of these statutes. (*See supra* note 12.) A consumer's ability to enforce his rights under the FDCPA or CFPA would no doubt be hindered if courts impose a

heightened pleading standard.  *See Inge v. Rock Fin. Corp.*, 281 F.3d 613, 620 (6th Cir. 2002) (holding, in light of the remedial nature of TILA, that 15 U.S.C. § 1605(f)(1)(A) — which provides that a finance charge disclosure is deemed accurate if it "does not vary from the actual finance charge by more than $100" — establishes an affirmative defense and not an additional pleading requirement). Absent some clear, binding directive from Congress, the Supreme Court, or the Eleventh Circuit, this Court finds it inappropriate to impose a heightened pleading standard in a consumer protection case, even if there is a fraud dimension to any of the claims.  Accordingly, the Court does not apply Rule 9(b) to the FDCPA or CFPA claims here.

### 2.    *Rule 8*

Relying on *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156 (D. Minn. 2013), Defendants argue that the Bureau's Affidavit Claims fail to satisfy Rule 8(a)'s plausibility standard.  The Court disagrees.

In *Ness*, the district court dismissed FDCPA claims under §§ 1692d, 1692e, and 1692f premised on the assertion that the defendant debt-collectors "falsely attested to personal knowledge of the debts in affidavits submitted with the motions for default judgment."  933 F. Supp. 2d at 1169.  The court explained that the plaintiffs had "plead no facts that would permit a reasonable inference that [the defendants] had no personal knowledge of the debts."  *Id.*  The court compared the case before it with *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010).  In *Sykes*, "the plaintiffs alleged that the

defendants' affiant signed the 'vast majority of the approximately 40,000 affidavits of merit' filed each year attesting to 'personal knowledge of key facts.'" *Ness*, 933 F. Supp. 2d at 1169 (quoting *Sykes*, 757 F. Supp. 2d at 420).   The court deduced that "[a]ssuming 260 business days per year, the affiant must have personally issued an affidavit once every three minutes."   *Id.*   Thus, the plaintiffs in *Sykes* had alleged "some facts that would allow a court to draw a reasonable inference that the affiant had no personal knowledge of the debt; Plaintiffs do not make any such allegations here."   *Id.* at 1169-70.

The Bureau's Complaint here is more similar to the complaint in *Sykes* than the threadbare complaint in *Ness*.   Here, the Bureau alleges that the Firm's debt-buyer clients were "often" unable to support their litigation claims with "basic documents, such as original contracts underlying the alleged debts or the chain of title evidencing that the debt buyer had standing to sue the consumer." (Compl. ¶ 20.)   Given the huge volume of lawsuits filed by the Firm, and the Firm's alleged lack of verification for the huge volume of affidavits it served along with its pleadings, it is plausible that some of these affidavits falsely conveyed that the affiants had personal knowledge of the debt.   Likewise, the Bureau's allegation that the Firm filed thousands of lawsuits without bothering to check whether the affidavits were based on the affiant's actual knowledge plausibly suggests that the Firm should have known that some of the affidavits were not in fact based on the affiant's personal knowledge.

Moreover, the Court recognizes that the Bureau's Affidavit Claims focus on Defendant's collection activities in the context of the debt-buyer market in which these debt claims arise.  As the Sixth Circuit has recognized, "Debt buyers now pay billions of dollars to purchase tens of billions of dollars of consumer debt each year, most of it charged-off credit card debt . . . .  Debt buyers usually purchase bad debts in bulk portfolios, often in the form of a spreadsheet, and rarely obtain the underlying documents relating to the debt."  *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 446 (6th Cir. 2014).  The Court takes judicial notice that debt buyers often or may routinely lack evidence of the debt they seek to recover.  With this backdrop, the Bureau's Affidavit Claims state a plausible claim under the FDCPA and CFPA.  *See Sykes*, 757 F. Supp. 2d at 424; *Keylard v. Mueller Anderson, P.C.*, No. 13 C 2468, 2013 WL 4501446, at *2 (N.D. Ill. Aug. 22, 2013) (holding that an allegation that a debt collector knew a service affidavit was false but nonetheless sought a default judgment based on the affidavit states a claim under § 1692f).

Defendants argue that even if some of the affidavits were not based on the affiant's personal knowledge, the Firm was "entitled to rely on the 'objectively reasonable representations' of its clients'" and thus cannot be held liable under the FDCPA if it turns out those representations were false.  (Mot. Dismiss at 29.) To support this argument, Defendants rely primarily on the standard for assessing sanctions against an attorney under Rule 11 of the Federal Rules of Civil Procedure.

Defendants' Rule 11 argument is unavailing.  It is true that, generally for purposes of Rule 11, "[a]n attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable." *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995) (quoting *Calloway v. Marvel Entm't. Grp.*, 854 F.2d 1452, 1470 (2d Cir. 1988), *rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entm't. Grp.*, 493 U.S. 120 (1989)).  But "'[r]easonableness under the circumstances' is the test to be applied." *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997).  And here, the circumstances alleged in the Complaint lead to the plausible inference that the Firm should have known some of its debt buyer clients (as opposed to creditor clients) did not have personal knowledge of the debts. Indeed, "the possibility of a debt collector attempting to collect a debt that it does not actually own, either through assignment or otherwise, is very real." *Webb v. Midland Credit Mgmt. Inc.,* No. 11-C-5111, 2012 WL 2022013, at n.8 (N.D. Ill. May 31, 2012).  This possibility is obviously more pronounced when, as here, the debt collector is attempting to collect a debt for a debt buyer rather than an original creditor.  *See* Federal Trade Commission, Collecting Consumer Debts: The Challenges Of Change, a Workshop Report at 22, 31 (Feb. 2009) available at https://www.ftc.gov/reports/collecting-consumer-debts-challenges-change-federal-trade-commission-workshop-report (discussing the problem raised by some practitioners that debt buyers receive "only a computerized summary of the creditor's business records when [they] purchase a portfolio" and "typically do

not have access to the original credit application with the consumer's signature, the specific contract that applied to the consumer's account, copies of original credit statements, or customer service records that could confirm or clarify a fraud claim or a legitimate consumer dispute").

At this early stage of litigation, the Bureau's Affidavit Claims sufficiently allege FDCPA and CFPA violations.[19]

### E.    Statute of Limitations

The final issue raised by the parties is whether the one-year statute of limitations applicable generally to FDCPA claims, 15 U.S.C. § 1692k(d), applies to the Bureau's FDCPA claims here.[20]   Defendants advocate for the one-year statute of limitations, relying on the plain terms of the statute.   The Bureau urges the Court to apply no statute of limitations at all, arguing *inter alia* that this approach is consistent with the overall statutory structure.   And the Court recognizes a third possibility:  that the CFPA's fall-back three-year statute of limitations, 12 U.S.C. § 5564(g), might apply.   As explained below, the Court rejects the Bureau's position that Congress intended to impose no time limitations on the Bureau when it comes to bringing FDCPA claims.   The Court,

---

[19] The Court recognizes it may turn out after discovery that, based on all the circumstances, the Firm had no reason to doubt the veracity of the affidavits, and that the affidavits in fact truthfully reflected the amount owed and other relevant facts.

[20] Defendants also move to dismiss the Bureau's CFPA claims based on conduct that pre-dates July 21, 2011, the "designated transfer date" on which certain authorities from other agencies were transferred to the Bureau and on which § 5536(a) became effective.  (Mot. Dismiss at 37-39, Doc. 20 (citing 75 Fed. Reg. 57252, 57252 (Sept. 17, 2010); 12 U.S.C. § 5531 note).)  The Bureau has clarified that it does not seek to enforce the CFPA as to conduct that occurred before July 21, 2011.  (Resp. n.102, Doc. 26.)

however, declines to decide at this time whether a one-year or three-year statute of limitations should apply.

According to Defendants, the inquiry begins and ends with § 1692k(d). They note that section 1692k(d) expressly provides, "An action to enforce *any liability created by this subchapter [the FDCPA]* may be brought in any appropriate United States district court . . . within one year from the date on which the violation occurs."   15 U.S.C. § 1692k(d) (emphasis added).   As Defendants argue, "any liability" means *any* liability, including liability to the Government in an action brought by the Bureau.   *See, e.g.*, *Black's Law Dictionary* (10th ed. 2014) (defining liability, in part, as "legal responsibility to another or to society, enforceable by civil remedy or criminal punishment").   This argument, rooted in the statute's plain text, has obvious appeal.   *See Miljkovic*, 2015 WL 3956570, at * 8 (noting that the "expansive" phrase "with respect to *any* person" in 15 U.S.C. § 1692k(a) "is properly understood to encompass all persons") (emphasis added) (citing *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001) ("[I]n the absence of any language limiting the breath of [the] word ['any'], it must be read as referring to all of the subject that it is describing.") (internal quotation marks omitted)).

For its part, the Bureau looks not only at subsection (d), but also at the rest of § 1692k and the following subsection, § 1692*l*, to infer that, although the statute announces a one-year statute of limitations for "an action to enforce any liability under this subchapter," the statute actually applies only to actions to

enforce liability to individual consumers.   The Court is of course required to consider the entire statute, and not individual terms in isolation.  *See Harrison v. Benchmark Elec. Huntsville, Inc.* 593 F.3d 1206, 1212 (11th Cir. 2010) ("We do not look at one word or term in isolation, but instead we look to the entire statutory context.") (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999)).   Section 1692k, entitled "Civil liability," begins with two subparagraphs that are expressly focused on liability "to any person," not liability to the Government.  Specifically, § 1692k(a) provides that "any debt collector who fails to comply with any provision of this subchapter *with respect to any person* is *liable to such person* in an amount equal to the sum of" the enumerated examples below.   15 U.S.C. § 1692k(a).  Section 1692k(b) then provides factors courts should consider in determining the amount of liability to assess in (a).  The Bureau thus contends that § 1692k would be "incongruous if read to apply to a government enforcement action," since a debt collector's FDCPA violation is not "with respect to the government "in any meaningful sense."  (Resp. at 35.)  The Bureau essentially argues that the limiting language in (a) and (b) applies to all subparagraphs of § 1692k.

According to the Bureau, that § 1692k addresses only civil liability in a *private* enforcement action, as opposed to compliance in an action brought by the Bureau or the Federal Trade Commission, is buttressed by the fact that the scope of administrative enforcement actions is expressly addressed in the following section, § 1692*l*.  Section 1692*l*, entitled "Administrative enforcement,"

provides that the Federal Trade Commission and the Consumer Financial Protection Bureau are "authorized to *enforce compliance* with this subchapter." 15 U.S.C. §1692*l*(a) (emphasis added); *see also id.* § 1692*l*(b). This section does not use the term liability.[21]  (*See* Resp. at 36 ("[Section 1692*l*(b)] authorizes the Bureau's enforcement action, [but] makes no reference to enforcing 'liability.'").) And more importantly, the Bureau points out that § 1692*l* contains no statute of limitations.

The Bureau finally argues that because § 1692*l* contains no statute of limitations, none should apply here.  The Bureau relies on the canon of construction, *quod nullum tempus occurrit regi* or "time does not run against the King." (Resp. at 37-38.)  The general rule is "that statutes of limitations are construed narrowly against the government."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006) (citing *E.I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456 (1924)).  As the Bureau articulates it, "[i]n the absence of a congressional enactment clearly imposing a limitations period, the United States, in its

---

[21] The Bureau also asserts that a 1977 Senate Banking Committee report supports its reading of the statute.  The Court disagrees.  It is true that, like the final version of the FDCPA, the report the Bureau cites separately addresses private enforcement actions and administrative enforcement actions.  *See* S. Rep. No 382, 95th Cong, 1st Sess. at 5 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699-1700.  But the Report in its separate discussions of the two types of actions makes no mention of the statute of limitations.  *See id.*  When the Report later provides a "section-by-section summary," the Report, like the statute itself, in no way indicates that the statute of limitations is limited to private actions.  *See id.* at 1702 ("Jurisdiction for actions is conferred on U.S. district and state courts; there is a 1 year statute of limitations.").  In fact, one reading of the Report suggests that the drafters of the legislation did not make the semantic distinction the Bureau advocates for between the terms "civil liability" and "enforcing compliance."  As the Bureau observes, the Senate Banking Committee "view[ed] this legislation as primarily self-enforcing; consumers who have been subjected to collection abuses will be *enforcing compliance*."  *Id.* at 1699.  But according to the Bureau, the administrative agencies "enforce compliance," and the consumers commence actions to enforce liability.  (Resp. at 35-36.)  In sum, this Senate Report is unhelpful to the Court's analysis here.

governmental capacity, is not subject to one." (Resp. at 38 (citing *Davis*, 264 U.S. at 462).)

To bring this last point home, the Bureau relies on two actions brought by the Securities and Exchange Commission ("SEC"), in which the Eleventh Circuit held that the SEC was not subject to the limitations period applicable to private actions. *SEC v. Diversified Corporate Consulting Grp.*, 378 F.3d 1219, 1224 (11th Cir. 2004); *SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004). In *Diversified Corporate Consulting*, the court considered what statute of limitations to apply when Congress was silent as to the limitations period applicable to the SEC. The defendant urged the court to "borrow" an analogous statute of limitations that was expressly applicable to private actions brought under 15 U.S.C. § 77*l*. The court declined to do so. It reaffirmed the principle that "[w]hen the United States brings suit in its sovereign capacity, a statute of limitations does not ordinarily apply unless Congress has expressly provided otherwise." *Diversified Corporate Consulting*, 378 F.3d at 1224 (citing *Calvo*, 378 F.3d at 1218).

> When the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity. This is so even though the SEC seeks disgorgement as a remedy of the violation and even though the disgorged proceeds may be used to compensate the defendant's victims.

*Id.* Because the relevant statute, 15 U.S.C. § 77t, contained no statute of limitations, the court held that the SEC was not subject to a statute of limitations.

The Court agrees that if Congress were silent as to the limitations period applicable to the Bureau's FDCPA claim, invoking this canon of construction would make sense.  Here, however, the Court is hard-pressed to proclaim that Congress was silent as to the limitations period applicable to claims brought by the Bureau.  The CFPA's own limitations provisions, and the provisions relevant to the Bureau's predecessor agency the FTC, suggest that Congress envisioned *some* statute of limitations applying when the Bureau brings an action.  Section 5564(g) of the CFPA specifically proscribes the "[t]ime for bringing action." "Except as otherwise permitted by law or equity," § 5564(g) provides, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates."  12 U.S.C. § 5564(g).  Thus, under the CFPA, the Bureau generally has three years to bring an action from the date of discovery of the violation.  12 U.S.C. § 5564(g)(1); *see also* 15 U.S.C. § 57b(d) (providing that generally, the FTC shall be subject to a three-year statute of limitations).  It seems odd that Congress would have provided a time limitation for consumers to bring FDCPA claims and the Bureau to bring CFPA claims, but placed no limitation on the Bureau's authority to bring FDCPA claims.  For this reason, the Court rejects the Bureau's argument that no statute of limitations should apply.

Rejecting the Bureau's position, however, does not resolve this issue because it is at least arguable that the appropriate limitations period for the Bureau's FDCPA claim is in fact provided in the CFPA itself, 12 U.S.C. § 5564(g).

64

While both sides anchor their arguments in the text of the FDCPA, neither side advocates for the application of the CFPA's three-year statute of limitations. Neither side, however, clearly articulates why the three-year period does not apply here.  This section, in full, provides:

> (g) Time for bringing action
>
> (1) In general
>
> Except as otherwise permitted by law or equity, ***no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates***.
>
> (2) Limitations under other Federal laws
>
> (A) In general
>
> An action arising under this title does not include claims arising solely under enumerated consumer laws.
>
> (B) Bureau authority
>
> In any action arising ***solely under an enumerated consumer law***, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable.
>
> (C) Transferred authority
>
> In any action arising solely under laws for which authorities were transferred under subtitles F and H, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable.

12 U.S.C. § 5564(g) (emphasis added).

One way to read this section is to hold that, absent some clear directive to the contrary, the Bureau's "action," which was expressly brought under title 12, (*see* Compl.), should be subject to a three-year statute of limitations.  Admittedly,

the subparagraphs address actions that include claims or actions "arising solely under enumerated consumer laws," but they do not clearly foreclose the application of the three-year statute of limitations here.  For example, Subparagraph (g)(2)(B) provides that for "any *action* arising solely under an enumerated consumer law, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable." 12 U.S.C. § 5564(g)(2)(B).  In other words, if the action arises solely under the FDCPA, the Court should turn to the FDCPA's one-year limitations period.  But the action here arguably arises both under an enumerated consumer law, the FDCPA, *and* the CFPA.  Thus, this is not an action arising "solely" under the FDCPA, and perhaps the three-year limitations period applies.

Unfortunately, subparagraph (g)(2)(A) does little to clarify.  According to subparagraph (g)(2)(A), "[a]n *action* arising under this title does not include *claims* arising solely under enumerated consumer laws." 12 U.S.C. § 5564(g)(2)(A) (emphasis added).  It is unclear what this section means.  Perhaps subparagraph (g)(2)(A) means that for purposes of the three-year statute of limitations for any action "brought under this title [Title 12]," an action cannot include FDCPA claims.  This would cut against applying a three-year statute of limitations here.  But this interpretation would also suggest that the three-year statute of limitations period wouldn't apply at all if the action includes an FDCPA claim, causing one to wonder when the three-year limitations period would ever apply.  To muddy the waters more, subsection (g)(1) refers to an action "brought

under this title" while subsection (g)(2)(A) refers to any action "arising under" this title.  It is not clear whether those phrases have different meanings, but presumably they do.  Thus, absent additional argument or guidance, the Court at this time cannot reject the possibility that Congress intended for a three-year statute of limitations to apply in a case such as this one.

Finally, a survey of case law across the country has revealed little that is helpful to resolving the statute of limitations question here.  The only case somewhat on point presented to the Court is one from this district, but if anything, it seems to favor the application of a three-year statute of limitations. In *FTC v. CompuCredit*, a Magistrate Judge in this district rejected the application of the one-year statute of limitations in an action brought by the Federal Trade Commission ("FTC"), for essentially the reasons advocated by the Bureau. *Fed. Trade Comm'n v. CompuCredit*, No. 1:08–CV–1976–BBM–RGV, 2008 WL 8762850, at *10 (N.D. Ga. Oct. 8, 2008).[22]  The Honorable Judge Russell G. Vineyard concluded, without discussion,[23] that § 1692k(d) applies only to actions by 'consumers' against 'debt collectors.'"  *Id.*  He reasoned that, by definition, the term "consumer" does not include the Government and thus

---

[22] *CompuCredit* settled before the District Judge had occasion to consider Judge Vineyard's Report and Recommendation.
[23] Judge Vineyard relied without elaboration on *Weiss v. Regal Collections*, 385 F.3d 337, 341 (3d Cir. 2004).  *Weiss* observed that different remedies are available for private litigants acting under § 1692k and government agencies acting under § 1692*l*.  *Weiss*, 385 F.3d at 341.

§ 1692k(d) does not apply to the FTC.  *Id.*  He then found that the FTC action was governed by § 1692*l*, which expressly contains no limitations period.[24]  *Id.*

Judge Vineyard did not stop there, however.  Rather than applying no limitations period at all, as the Bureau would have presumably argued had it been litigating the case, Judge Vineyard noted that under § 1692*l*, "to enforce compliance by any person under [the FDCPA]," the FTC is limited to "[a]ll of the functions and powers of the [FTC] under the [FTC] Act."  15 U.S.C. § 1692*l*(a). Judge Vineyard thus turned to the powers of the FTC under 15 U.S.C. § 57b(d). This section provides a three-year statute of limitations for any action brought by the FTC to enforce the FTC Act's prohibition against unfair or deceptive acts or practices.  15 U.S.C. § 57b(d).  Judge Vineyard reasoned that because violations of the FDCPA are "deemed an unfair or deceptive act or practice" in violation of the FTC Act, 15 U.S.C. § 41 *et seq.*, the FTC Act's three-year statute of limitations should apply.  *Id.*

Thus, even if the Bureau were correct that § 1692k(d) was inapplicable because the Bureau, rather than a consumer, brought this case, the Court could

---

[24] 15 U.S.C. § 1692*l*(a) provides, "The [FTC] shall be authorized to enforce compliance with this subchapter, except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to another Government agency under any of paragraphs (1) through (5) of subsection (b), subject to subtitle B of the Consumer Financial Protection Act of 2010.  For purpose of the exercise by the [FTC] of its functions and powers under the [FTC] Act (15 U.S.C. 41 *et seq.*), a violation of this subchapter shall be deemed an unfair or deceptive act or practice in violation of that Act.  *All of the functions and powers of the [FTC] under the [FTC] Act are available to the [FTC] to enforce compliance by any person with this subchapter,* irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests under the [FTC] Act, including the power to enforce the provisions of this subchapter, in the same manner as if the violation had been a violation of a [FTC] trade regulation rule." (Emphasis added.)

arguably follow Judge Vineyard's reasoning and hold that § 1692*l* indirectly imposes the three-year statute of limitations from the CFPA onto the FDCPA claim.   As the Bureau recognizes, violations of the FDCPA are expressly recognized in the statute as violations of the CFPA.   (*See* Resp. at 24.)  12 U.S.C. § 5536(a)(1)(A).  Just as Judge Vineyard applied the three-year FTC Act statute of limitations, this Court could apply the equivalent limitations period of the CFPA. No party, however, has advocated for this approach.

As the Court rejects the "no limitations period" argument, the Court is left at this point with two possibilities:  limiting the Defendants' potential liability to conduct occurring within one year of the filing of this lawsuit, or reaching back a full three years for liability purposes.  Either way, however, no claim in this action will be completely foreclosed on statute of limitations grounds.  And as a practical matter, it makes little difference at this stage of litigation whether a one-year or three-year statute of limitations applies.  The Bureau's CFPA claims under 12 U.S.C. § 5536(a), which are not time-barred, are based on the same conduct as the FDCPA claims and thus support the same discovery.  The CFPA claims reach back to conduct occurring on July 21, 2011, (*supra* note 20), one week shy of three years from the date this case was filed on July 14, 2014.  Thus, a decision between the one- and three-year limitations period would do little to narrow the scope of discovery.  Given the uncertainty regarding the appropriate statute of limitations to apply here, and the real possibility that other courts at the district or appellate level will in the next year address similar statute of limitations issues

involving this relatively new agency and its enforcement power, the Court declines at this time to rule on this issue so as to consider further judicial developments that may be of assistance.  Defendants may reassert the statute of limitations defense on summary judgment or in light of relevant circuit court decision developments.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss [Doc. 20].

**IT IS SO ORDERED** this 14th day of July, 2015.

**Amy Totenberg**
**United States District Judge**